## Rhodes Amusement Enterprises, Inc., v. Cameron.

*Appeals from decisions of the Secretary of Banking—Plan of business—Securities Act of 1923.*

1. In passing upon appeals from decisions of the Secretary of Banking, under the Securities Act of June 14, 1923, P. L. 779, the court should consider only the rights of the plaintiff and the protection of the public.

2. In this case the court found that the rights of the plaintiff were amply protected by the plan of doing business proposed by it, but that the public was not protected.

3. The plan of business of the Rhodes Amusement Enterprises, Inc., is unfair, unjust and inequitable.

Appeal from decision of the Secretary of Banking. C. P. Dauphin Co., Commonwealth Docket, 1925, No. 131.

*Hause, Evans & Baker,* for plaintiff.

*J. W. Brown,* Deputy Attorney-General, and *F. E. Montgomery,* for defendant.

WICKERSHAM, J., Nov. 6, 1925.—The petitioner applied to the Secretary of Banking to be registered as a dealer under "The Securities Act," approved June 14, 1923, P. L. 779. The general plan and character of the business of the applicant was stated as follows:

"*(a)* The applicant is engaged in outdoor amusements, which will eventually be located and operated at various outdoor pleasure resorts throughout the country. At present, active operations are in connection with the Sesqui-Centennial, Philadelphia, Pa.

"*(b)* The nature of the securities is the common stock of the company, being the only form issued by the company.

"*(c)* It is planned to sell this stock by personal solicitation, principally to personal friends.

"*(d)* The company will act as principal."

The application of the petitioner for registration as aforesaid was refused by the Secretary of Banking, whereupon the petitioner filed its appeal with this court, setting forth the facts and praying for a reversal of the decision of the Secretary of Banking refusing the registration of the petitioner as a dealer in securities.

The defendant filed his answer admitting the allegations contained in the first four paragraphs of plaintiff's petition, and that part of the sixth paragraph thereof, in so far as it mentions the incorporation of the petitioner and the issuance of stock, and denying the allegations in paragraphs five, seven and part of paragraph six thereof. The answer also sets up matters of defence to which we will refer hereafter.

This case came on to be heard by the court, whereupon testimony was taken in support of the allegations contained in the petition and answer, and, after being fully argued at length by counsel for the petitioner and by the Deputy Attorney-General, we find the following

### Facts.

1. The petitioner is a corporation organized and existing under the laws of the State of Delaware and registered to do business within the Commonwealth of Pennsylvania under date of Aug. 3, 1925.

2. The petitioner is incorporated for the purpose, *inter alia,* of conducting amusement enterprises, and purposes in the conduct of its business to erect and operate a number of amusement enterprises under a certain concession

granted to it by the Sesqui-Centennial Association, a corporation of the State of Pennsylvania, which is to hold an international exhibition in the City of Philadelphia in the year 1926.

3. The petitioner has an authorized capital stock of 1,000,000 shares with a par value of $1 per share, a part of which it proposes to sell to the public at par, for the purpose of raising the capital necessary in the conduct of its business.

4. The first meeting of the board of directors of the petitioner, the Rhodes Amusement Enterprises, Inc., composed of H. E. Potter, Francis. J. Riera, Jr., and Ray C. Arnold, was held July 27, 1925, whereupon officers were elected and the treasurer was required to give a bond in the sum of $1 with one surety.

5. It further appeared that the secretary presented a draft of an agreement between Charles F. Rhodes and the petitioning corporation for the sale by Rhodes to the petitioning corporation of the said concession license dated July 14, 1925, whereupon preambles and resolutions were duly adopted, wherein it was agreed, among other things, that the company purchase from Rhodes the said concession license upon the terms set forth in said agreement.

6. Thereafter, but upon the same day, H. E. Potter resigned as president and director of the company and Charles F. Rhodes was duly elected by the company to fill said vacancies as president and a member of the board of directors. Arnold, the treasurer, next presented his resignation as treasurer and director, and John W. Dawson was duly elected to fill the said vacancy as treasurer, bond of the new treasurer being fixed at $1; and Vincent P. Wyatt was elected secretary of the company. Francis J. Riera, Jr., also resigned as vice-president and a director in the said company, and Richard E. Souse was elected to fill said vacancy.

7. The Sesqui-Centennial Exhibition Association granted to C. F. Rhodes the following concessions: "Old Vienna," "Water Carnival," "Old Plantation," "Congress of Beauties," "Hawaiian Village" and "Riding Devices," and a license was issued to him to construct, maintain and operate said concessions, signed by William Abrahams, Director of Concessions, July 14, 1925.

8. On July 21, 1925, C. F. Rhodes made application to William Abrahams, Director of Concessions of the Sesqui-Centennial Exhibition Association, for permission to transfer his interest and rights in the concessions so granted to him to the Rhodes Amusement Enterprises, Inc., which application was granted July 26, 1925, and the license granted to Rhodes on July 14, 1925, was revoked.

9. On July 27, 1925, Charles F. Rhodes sold all his right, title and interest in the concessions granted to him July 14, 1925, to the Rhodes Amusement Enterprises, Inc., the petitioner in this case, and on the same day the Sesqui-Centennial Exhibition Association issued its license to the petitioner to construct, maintain and operate the said concessions, said license being signed by William Abrahams, Director of Concessions.

10. On or about Aug. 3, 1925, the petitioner, in accordance with the Securities Act, filed with the Secretary of Banking of the Commonwealth of Pennsylvania an application for registration as a dealer in securities, and paid to the defendant the fee provided for in said act. With said application the petitioner filed letters of recommendation as required by law, and furnished to the Secretary of Banking such other data and information requested of it.

11. On Sept. 4, 1925, the Secretary of Banking gave notice to the petitioner that its application for registration as a dealer in securities was refused because of the unfair basis for the distribution of petitioner's capital stock.

12. Two hundred and fifty thousand shares of the capital stock of the petitioning corporation, of the par value of $1 per share, full paid and non-assessable, were issued, but not yet delivered, to Charles F. Rhodes as the consideration for the transfer by him to said corporation of the said concession license, which he, the said Charles F. Rhodes, secured from the Sesqui-Centennial Exhibition Association, for the acquiring of which nothing was paid.

13. For the performance by the said Rhodes of the several matters mentioned in the agreement heretofore referred to, Rhodes was to receive compensation to be determined by the board of directors of the petitioner, of which board he was the president and largest stockholder.

14. All payments of the petitioning corporation were to be made by the treasurer by checks signed by him and the president, Rhodes. The treasurer gave bond in the sum of $1, the security upon which bond was Rhodes, the president of the corporation.

15. It was agreed that 51 per cent. of the stock of this corporation was to be controlled by Rhodes, the president, Dawson, the treasurer, and Souse, a director; Rhodes received 250,000 shares of the capital stock of said corporation; at the time of the hearing it had not been determined how much Dawson and Souse were to pay for the shares they were to receive in order that the three might control 51 per cent. of the stock. Fritz Pflug was to receive for his work of supervising a certain restaurant 25,000 shares of the common stock and a salary of $12,000 a year.

16. Before issuing the concession license to Rhodes, William Abrahams, Director of Concessions of the Sesqui-Centennial, informed Rhodes that any party of gentlemen who get together for the purpose of exploiting the public in order to get money together to get a concession is not permitted.

17. William Abrahams assured the court that if the Bureau of Securities would register the petitioning corporation to sell stock, he would cancel the concession license issued to the petitioner.

18. The petitioning corporation also filed an application for the registration of Charles F. Rhodes, John W. Dawson and Vincent P. Wyatt as its agents or salesmen to sell that part of the capital stock of the corporation which was offered to the public.

### Discussion.

The course which this court must follow in passing upon appeals from the decisions of the Secretary of Banking has been charted by the legislature in section 19 of the Securities Act (Acts of 1923, P. L. 787), wherein it is provided that "mere technical irregularities in the procedure of such commissioner shall be disregarded. The court's decision shall consult only the rights of the plaintiff and the protection of the public." Applying this legislative mandate to the evidence, we find:

The rights of the petitioner do not seem to have been overlooked by its board of directors; certainly the rights of the several members of the board of directors were not forgotten. The president, Rhodes, received 250,000 shares of the capital stock of the association, for which he paid nothing (Notes of Testimony, pages 56-57), and which were awarded to him by dummy directors of his corporation for the concessions he had obtained for nothing (Notes of Testimony, pages 58-62-63). In addition to the stock consideration of $250,000, he is to receive a salary to be fixed by the board of directors, of which he is the majority stockholder (Notes of Testimony, pages 39-57-58), Fifty-one per cent. of the million shares of the capital stock of

this corporation are to be controlled by the board of directors, consisting principally of Rhodes, Dawson and Souse, and it has not been definitely determined what Dawson and Souse are to pay for the shares they are to receive in order that 51 per cent. of the capital stock may be controlled by them. Rhodes testified that the profit this corporation expected to make out of the concessions granted to it by the Sesqui-Centennial Association will be $2,000,000 (Notes of Testimony, page 36), and all the money received by the corporation is to be disbursed upon checks signed by the treasurer, Dawson, and countersigned by Rhodes, the president; yet the board of directors fixed the bond of the treasurer who is to handle this vast sum of money at $1, and Rhodes, the president, became security for the treasurer, Dawson, upon this bond of $1. So we repeat, the rights of the board of directors of the petitioning corporation were in no way overlooked or disregarded. How about the protection of the public?

If it is true that 51 per cent. of the capital stock of this corporation is to be controlled by the three directors and officers, Rhodes, Dawson and Souse, then only 49 per cent. of the stock could be sold to the public; in other words, the public would contribute towards the success of this enterprise 49 per cent. of $1,000,000, or $490,000, because it has not been determined what Dawson and Souse are to pay for the stock which they are to own in order that the three, Rhodes, Dawson and Souse, may control the corporation; therefore, the $490,000 contributed by the public is to be invested in the sesqui-centennial activities of the corporation in order to secure the success of the petitioning corporation, and in order that the $2,000,000 profit which Rhodes testified they expected to earn might be realized. Rhodes, Dawson and Souse, in that event, would receive 51 per cent. of the profits, while the public contributing all of the capital would only receive 49 per cent. Rhodes testified that the contributors to the capital stock obtained prior to the hearing were satisfied that he, Dawson and Souse should control 51 per cent. of the stock, but at the time of the hearing subscriptions of eleven persons for only $45,500 of the stock had been taken, of which only $9000 had been actually paid to the treasurer—Souse and Dawson were two of these eleven subscribers. We cannot, therefore, predicate much on the agreement of the eleven present subscribers to the capital stock that 51 per cent. thereof should be in the possession and control of the three. Rhodes testified that it was the intention to only sell the stock to a few personal friends. If this was his real intention, why was the par value of the stock fixed at $1 per share? There seems to be inconsistency between his testimony of his intention and what he actually did; furthermore, it was proposed to present 25,000 shares to Pflug in addition to a salary of $12,000 a year, in order that he might be persuaded to manage one of the concessions granted to the petitioner.

It further appears from this record that the petitioner made application to the Secretary of Banking to register Charles F. Rhodes, John W. Dawson and Vincent P. Wyatt, the latter being secretary of the plaintiff corporation, as agents to sell this capital stock to the public. They were to receive a commission of not more than 15 per cent. Here, again, we have Rhodes and Dawson setting up the machinery by which they could secure still further profits from this corporation by selling its capital stock at a commission. The Secretary of Banking evidently took all these matters into consideration when he reached the conclusion that registration of the plaintiff as a dealer in securities should be refused because the unfair distribution of the capital stock of the corporation did not consult the "protection of the public," and with this conclusion we are in accord.

Rhodes Amusement Enterprises, Inc., v. Cameron.

The Secretary of Banking declined to register the plaintiff as a dealer in securities. He could not have done otherwise without disregarding the plain mandate of section 7 of the Securities Act, which provides, *inter alia*, that "if the commissioner is satisfied that the applicant is of good repute and that the proposed plan of business of the applicant is not unfair, unjust or inequitable, he shall register the applicant and issue to him a registry certificate." A careful study of the testimony offered by the plaintiff in this case convinces us that the Secretary of Banking, having in mind the proposed distribution of the capital stock of this corporation—the further fact that this million-dollar corporation, hoping to conduct a business which would yield $2,000,000 profit, provided that the treasurer should only be bonded in the sum of $1, with the president as his security, and all of the money disbursed by this company was to be paid out upon checks signed by the treasurer and counter-signed by the president—could not possibly have reached the conclusion that the proposed plan of business of the applicant was fair, just and equitable. We are of the opinion that the Secretary of Banking reached the proper conclusion in refusing to register this plaintiff as a dealer in securities, and, therefore, we find the following

### Conclusions of law.

1. The proposed plan of business of the plaintiff is unfair, unjust and inequitable.

2. The Secretary of Banking was justified in refusing to register the plaintiff as a dealer in securities, and his refusal so to do is affirmed.

3. The cost of these proceedings are to be paid by the plaintiff.

From George R. Barnett, Harrisburg, Pa.